[Cite as *State v. Ortiz*, 2016-Ohio-354.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. Sheila G. Farmer, P.J. |
|  | : | Hon. W. Scott Gwin, J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2015CA00098 |
| PETER ORTIZ | : |  |
|  | : |  |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Criminal appeal from the Stark County
Court of Common Pleas, Case No.
2014CR1640

JUDGMENT:     Affirmed

DATE OF JUDGMENT ENTRY:     February 1, 2016

APPEARANCES:

For Plaintiff-Appellee                 For Defendant-Appellant

JOHN D. FERRERO                   BERNARD HUNT
Stark County Prosecutor            2395 McGinty Road N.W.
BY: RONALD MARK CALDWELL     North Canton, OH 44720
110 Central Plaza South, Ste. 510
Canton, OH 44702-1413

*Gwin, J.*

**{¶1}**   Defendant-appellant Peter Ortiz ["Ortiz"] appeals his convictions and sentences after a jury trial in the Stark County Court of Common Pleas on one count of aggravated murder with a firearm specification, having weapons while under disability, and possession of a firearm in liquor permit premises.

*Facts and Procedural History*

**{¶2}**   On October 1, 2014, Ortiz and Akira "A.K." Kirksey ["Kirksey"] were both employed bussing tables and washing dishes at the Blue Fig Bar & Grill restaurant in Alliance, Ohio. While in the kitchen area, the two began to argue around noon about who was going to help the barmaid, Amber Fletcher, with bussing the bar. The one who would help her bus her area would also share in the tips, and the person who would normally perform this task was the usual busser, Kirksey. Ortiz, however, felt he should be the one to help Fletcher. Their argument became heated, drawing the attention of the other co-workers. Mary Beth Fails, a server at the restaurant, told the two men to stop arguing and get back to work, as there were customers present. Fletcher walked into the kitchen area as well, noticing that Ortiz had a knife, and Benjamin Carl, a cook working in the kitchen, got between the two and asked them to stop arguing. Ortiz eventually left the restaurant. Many of the co-workers thought he left in order to cool off, maybe even taking the rest of the day off. Fletcher then heard Kirksey mutter to himself that Ortiz did not know with whom he was messing.

**{¶3}**   Ortiz, however, did not cool off, but instead drove home to his apartment, located approximately ten minutes from the restaurant, and retrieved his fully loaded handgun. Ortiz then drove back to the restaurant to immediately seek out Kirksey. Upon

entering the restaurant, Ortiz walked by Fails, who was outside the back door smoking a cigarette. She asked Ortiz if he had cooled down, and he responded that everything was fine. Fails did not see the handgun concealed in Ortiz's waistband. Ortiz then went inside and found Kirksey loading dirty dishes into a bus tub. Michelle Grimes, a server at the restaurant, heard Ortiz dare Kirksey to call him something again. Kirksey replied that they were cool, that he knew where Ortiz lived and that they could settle this matter there after work. Kirksey then turned to walk away, at which time Ortiz pulled his handgun and immediately fired three shots at him. One shot entered Kirksey's arm in the back; the other two shots, both independently fatal, entered Kirksey's back right shoulder and the back of his head. Kirksey's immediately fell to the floor. Ortiz went into the bar area, grabbed a bottle of tequila, and poured himself a drink. Fletcher, having heard the shots, saw Ortiz come to her bar and pour himself a drink. Ortiz looked at her and advised her that she had better call 9-1-1.

{¶4} Hearing the shots, Fails ran inside to see people running out of the restaurant, saying that A.K. had been shot. Carl, the cook at the Blue Fig, immediately ran outside upon hearing the shots and ran to the motel located next door, where he called 9-1-1. Grimes ran for cover in the restaurant. Fletcher took her cell phone and went to Kirksey to check on him. She found his lifeless body on the floor in a small hallway by the kitchen, with blood covering the floor. She knelt down to check for a pulse on Kirksey's neck while calling 9-1-1. While Fletcher was on the floor tending to Kirksey, she was startled to see Ortiz return with his gun in hand. Fletcher begged Ortiz not to shoot Kirksey again, and not to shoot her since she was pregnant. Ortiz walked up to them, put the gun

to Kirksey's chin, and fired one more shot. He then exited the restaurant and waited in the adjacent parking lot for the police to arrive.

{¶5} Officers from the Alliance Police Department arrived shortly after Fletcher's 9-1-1 call. The first officer to respond, Officer Aaron Perkins, was met by restaurant employees in the parking lot, who pointed out Ortiz to him as the shooter. Perkins immediately confronted Ortiz, who threw down his gun and submitted to his arrest. As Perkins started to advise Ortiz of his rights, Ortiz blurted out, "I shot him, I shot him." 1T. at 149-150. Alliance Detective Donald Wensel arrived at the scene after Perkins, and after checking on the victim and the restaurant employees, approached the handcuffed Ortiz to speak with him. Officer Perkins told Detective Wensel that Ortiz had been notified of his rights. Detective Wensel then obtained Ortiz's consent to search his car and apartment, and then asked him what had happened. Ortiz admitted to shooting Kirksey because he had had enough of him, so he went home, got his gun, and returned and shot him to death. 1T. at 186.

{¶6} This exchange was recorded, and played to the jury. 1T.at 193 (State's Exhibit 8). Detective Wensel then searched Ortiz's car, finding nothing of evidentiary value, after which he made the short drive to Ortiz's apartment. Inside the apartment, he found a box of ammunition that matched the bullets he found in the magazine of Ortiz's handgun. This magazine, if it had been fully loaded, was missing four bullets. Finally, Detective Wensel discovered that Ortiz was legally prohibited from having a gun due to his 2011 felony conviction for cocaine possession out of Summit County.

{¶7} Wensel timed the route to Ortiz's apartment, noting that it took him almost nine minutes to get there, and about eight minutes to return to the restaurant. Factoring

in the time it took to retrieve and load his gun, the detective estimated that the total time from when Ortiz left the restaurant until his return could have been as little as 20 to 25 minutes. Benjamin Carl estimated that Ortiz was gone from the restaurant for 45 minutes.

{¶8}   Ortiz testified in his defense at trial. He claimed that he had had prior altercations with Kirksey, mainly as a result of being blamed for changing Kirksey's work schedule to the worst shifts. Ortiz asserted that he had nothing to do with these shift changes. He even heard from others that Kirksey was going to beat him up and rob him, an accusation that Kirksey denied when Ortiz confronted him. Yet, Ortiz had found Kirksey sitting on his porch a couple times upon coming home, although Kirksey told him that he was simply waiting for a friend who lived upstairs. Ortiz was also told that Kirksey had been told that Ortiz had ratted him out to police, telling the police about Kirksey's alleged marijuana business. After the second time he found Kirksey sitting on his porch, he decided to buy a gun since the police or the restaurant managers would do nothing about the situation. Ortiz then took the gun to work and showed Kirksey, asking him where he could buy some bullets. Ortiz's purpose was to scare Kirksey.

{¶9}   On the day of the shooting, Ortiz claimed that Kirksey confronted him about the schedule changes. Ortiz admitted that he grabbed a knife, but asserted that he did so for protection. Fails broke up the argument. Kirksey, instead of quitting, threatened Ortiz that he knew where he lived, so Ortiz picked up a frying pan to defend himself. Ortiz then decided to leave, so he drove away, stopping to get gas and cigarettes before reaching his apartment. Once there, he retrieve his gun and returned to the restaurant.

{¶10}  Upon arriving back at the restaurant, Kirksey accused Ortiz of ratting on him, pointing a finger at Ortiz's eye and pushing him back. Ortiz, who claimed that he had picked

up some plates when he resumed working, threw these plates into a garbage can and pulled out his gun. According to Ortiz, Grimes then got between the two men, telling them that she did not have time for this. Kirksey then allegedly said to Ortiz, "Don't cry, wait until 3:00," apparently, referring to when he would get off work. As Kirksey turned his back to leave, Ortiz shot him three times. He then told Grimes that he had killed Kirksey, after which he went to the bar and took some pills by drinking some tequila. Ortiz admitted that he told Fletcher to call 9-1-1 as he sat at the bar.

{¶11} Ortiz testified that he did not hate Kirksey, but that his hatred developed and grew as he sat at the bar. As a result, he went back into the kitchen area and shot Kirksey once more. He then went outside to the parking lot to wait for the police. When asked why he had shot Kirksey, Ortiz blamed the shooting on the co-workers, who did not stop them or cool them down. He admitted that he had shot Kirksey three times in the back, but only began hating his victim after he had shot him, which prompted him to shoot him a fourth time. Finally, Ortiz admitted that he had told the police that he had shot Kirksey because he had called Ortiz a "bitch motherfucker" in front of everyone.

{¶12} Thomas Reitz, a busboy and dishwasher at the Blue Fig, testified that Kirksey once got so upset with Ortiz that he threatened to fight or rob him. This threat apparently got back to Ortiz, who showed up to work the next day to fight Kirksey. No fight or robbery, however, ever took place.

{¶13} Patrol officer Michael Donley of the Alliance Police Department testified that he had arrested Ortiz for a DUI in 2013, and had responded to a call at Ortiz's apartment a couple months before the shooting. Ortiz was intoxicated, and complained about a neighbor making too much noise that night. The neighbor, however, had driven away

before the police arrived, and Ortiz did not provide a name. After the shooting and his arrest, Ortiz asked to call Donley. In this phone call, Ortiz admitted to the officer that he had shot and killed Kirksey because Kirksey had allegedly threatened him.

{¶14} The jury returned with guilty verdicts on one count of aggravated murder with a firearm specification, having weapons while under disability and possession of a firearm in liquor permit premises, as charged in the indictment.

{¶15} The trial court sentenced Ortiz to an aggregate prison term of life imprisonment without the possibility of parole. The aggregate sentence was comprised of the following individual sentences, life imprisonment without the possibility of parole aggravated murder; mandatory consecutive three-year prison term for the firearm specification; prison term of 36 months on the charge of having weapons while under disability ; and a prison term of 12 months on the charge of possess of firearm in liquor permit premises.

*Assignments of Error*

{¶16} Ortiz raises three assignments of error,

{¶17} "I. THE TRIAL COURT ERRED WHEN IT DENIED THE APPELLANT'S MOTION TO ALLOW JURY INSTRUCTIONS ON THE LESSER INCLUDED OFFENSES FOUND IN O.R.C. 2903.02 AND O.R.C.2903.03.

{¶18} "II. THE TRIAL COURT ERRED WHEN IT DENIED THE APPELLANT HIS RIGHTS BASED UPON VIOLATIONS OF THE EQUAL PROTECTION AND DUE PROCESS CLAUSE OF THE UNITED STATES AND OF THE OHIO CONSTITUTION.

{¶19} "III. THE APPELLANT WAS DENIED HIS EFFECTIVE ASSISTANCE OF COUNSEL, WHICH VIOLATED HIS RIGHTS UNDER THE 6TH AND 14TH

AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE 1, SECTION 10 OF THE OHIO CONSTITUTION."

I.

{¶20} In his first assignment of error, Ortiz's challenges the trial court's ruling to deny his request to instruct the jury on the lesser-included offenses of murder and voluntary manslaughter. Ortiz argues that he presented evidence that showed that he acted spontaneously and not with prior calculation and design.

{¶21} The giving of jury instructions is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Martens*, 90 Ohio App.3d 338, 629 N.E.2d 462(3rd Dist. 1993). In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140(1983). Jury instructions must be reviewed as a whole. *State v. Coleman*, 37 Ohio St.3d 286, 525 N.E.2d 792(1988).

{¶22} Crim.R. 30(A) governs instructions and states as follows:

At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. Copies shall be furnished to all other parties at the time of making the requests. The court shall inform counsel of its proposed action on the requests prior to counsel's arguments to the jury and shall give the jury complete instructions after the arguments are completed. The court also may give some or all of its

instructions to the jury prior to counsel's arguments. The court need not reduce its instructions to writing.

On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury.

**{¶23}** Although Ortiz filed a request for jury instruction on voluntarily manslaughter, counsel withdrew this request,

[Defense Counsel]: Your Honor, I did file a request for jury instructions for both the lesser included of murder and voluntary manslaughter, based on the testimony I will limit my request to instruction on murder 2903.02 [sic.], subsection A.

2T. at 49.

**{¶24}** In *Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827, 144 L.Ed.2d 35(1999) the United State Supreme Court held that because the failure to properly instruct the jury is not in most instances structural error, the harmless-error rule of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 applies to a failure to properly instruct the jury, for it does not *necessarily* render a trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.

**{¶25}** Crim.R. 52(B) provides that, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional

circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804(1978), paragraph three of the syllabus. In order to find plain error under Crim.R. 52(B), it must be determined, but for the error, the outcome of the trial clearly would have been otherwise. Id. at paragraph two of the syllabus.

**{¶26}** The defendant bears the burden of demonstrating that a plain error affected his substantial rights. *United States v. Olano*, 507 U.S. at 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 308(1993); *State v. Perry*, 101 Ohio St.3d 118, 120 802 N.E.2d 643, 646(2004). Even if the defendant satisfies this burden, an appellate court has discretion to disregard the error and should correct it only to 'prevent a manifest miscarriage of justice.'" *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240(2002), *quoting State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804(1978), paragraph three of the syllabus. *Perry, supra*, at 118, 802 N.E.2d at 646.

**{¶27}** "Even though an offense may be statutorily defined as a lesser included offense of another, a charge on such lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense." *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus. In making this determination, the court must view the evidence in a light most favorable to defendant. *State v. Smith*, 89 Ohio St.3d 323, 331, 731 N.E.2d 645(2000); *State v. Wilkins*, 64 Ohio St.2d 382, 388, 415 N.E.2d 303(1980).

**{¶28}** Nevertheless, an instruction is not warranted every time any evidence is presented on a lesser-included offense. There must be "sufficient evidence" to "allow a jury to reasonably reject the greater offense and find the defendant guilty on a lesser

included (or inferior-degree) offense." *State v. Shane*, 63 Ohio St.3d at 632-633, 590 N.E.2d 272; *State v. Conway*, 108 Ohio St.3d at 240,842 N.E.2d at 1027, 2006-Ohio-791 at ¶ 134.

{¶29}  The Ohio Supreme Court has cautioned,

Past decisions of this court have sometimes given the erroneous impression that, whenever there is "some evidence" that a defendant in a murder prosecution may have acted in such a way as to satisfy the requirements of the voluntary manslaughter statute, an instruction on the inferior-degree offense of voluntary manslaughter must always be given. See, *e.g., State v. Muscatello* (1978), 55 Ohio St.2d 201, 9 O.O.3d 148, 378 N.E.2d 738, paragraph four of the syllabus. See, also, *Tyler, supra,* 50 Ohio St.3d at 37, 553 N.E.2d at 592. That clearly never has been the law in this state, nor is it the law today. The "some evidence" referred to in those cases is simply an abbreviated way of saying that a jury instruction must be given on a lesser included (or inferior-degree) offense when sufficient evidence is presented which would allow a jury to *reasonably* reject the greater offense and find the defendant guilty on a lesser included (or inferior-degree) offense.

To require an instruction to be given to the jury every time "some evidence," however minute, is presented going to a lesser included (or inferior-degree) offense would mean that no trial judge could ever refuse to give an instruction on a lesser included (or inferior-degree) offense. Trial judges are frequently required to decide what lesser-included (or inferior-

degree) offenses must go to the jury and which must not. The jury would be

unduly confused if it had to consider the option of guilty on a lesser included

(or inferior-degree) offense when it could not reasonably return such a

verdict.

*State v. Shane*, 63 Ohio St.3d at 632-633, 590 N.E.2d 272 (emphasis in original).

**Voluntary manslaughter.**

**{¶30}** Voluntary manslaughter is not a lesser-included offense of murder, but

rather is an inferior degree of murder. Nonetheless, when determining whether an

instruction on voluntary manslaughter should have been given, we apply the same test

utilized when determining whether an instruction on a lesser-included offense should

have been given. *State v. Shane*, 63 Ohio St.3d 630, 632, 590 N.E.2d 272(1992). An

instruction on voluntary manslaughter is appropriate when "the evidence presented at trial

would reasonably support both an acquittal on the charged crime of murder and a

conviction for voluntary manslaughter." Id. R.C. 2901.22.

**{¶31}** Voluntary manslaughter is defined in R.C. 2903.03(A):

No person, while under the influence of sudden passion or in a

sudden fit of rage, either of which is brought on by serious provocation

occasioned by the victim that is reasonably sufficient to incite the person

into using deadly force, shall knowingly cause the death of another.

**{¶32}** "Before giving a jury instruction on voluntary manslaughter in a murder

case, the trial judge must determine whether evidence of reasonably sufficient

provocation occasioned by the victim has been presented to warrant such an instruction."

*Shane,* at paragraph one of the syllabus. "The trial judge is required to decide this issue

as a matter of law, in view of the specific facts of the individual case. The trial judge should evaluate the evidence in the light most favorable to the defendant, without weighing the persuasiveness of the evidence." Id. at 637, *citing State v. Wilkins*, 64 Ohio St.2d 382, 388, 415 N.E.2d 303(1980). "An inquiry into the mitigating circumstances of provocation must be broken down into both objective and subjective components." *Shane*, at 634.

{¶33} When determining whether provocation was reasonably sufficient to induce sudden passion or sudden fit of rage, an objective standard must be applied. Id. "For provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *Shane* 63 Ohio St.3d at 635, 415 N.E.2d 303. Thus, the court must furnish "the standard of what constitutes adequate provocation, i.e., that provocation which would cause a reasonable person to act out of passion rather than reason." (Citations omitted.) *Shane* at 634, fn. 2. "If insufficient evidence of provocation is presented, so that no reasonable jury would decide that an actor was reasonably provoked by the victim, the trial judge must, as a matter of law, refuse to give a voluntary manslaughter instruction." *Shane* at 364. The subjective component of the analysis requires an assessment of "whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage." Id. "Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *State v. Mack*, 82 Ohio St.3d 198, 201, 694 N.E.2d 1328(1998).

{¶34} Unlike self-defense, the issue of who was the aggressor is not the determinative issue in a voluntary manslaughter defense; rather the appellant must show that he acted under a sudden rage or passion. Further, past incidents or verbal threats

do not satisfy the test for reasonably sufficient provocation when there is sufficient time for cooling off. *State v. Huertas,* 51 Ohio St.3d 22, 31–32, 553 N.E.2d 1058, 1068–1069 (1990). *See, also, State v. Pierce*, 64 Ohio St.2d 281, 18 O.O.3d 466, 414 N.E.2d 1038 (1980).

**{¶35}** The trial court in the case at bar should have given an instruction on voluntary manslaughter if the evidence presented at trial demonstrated that Ortiz had killed Kirksey while under the influence of a sudden passion or fit of rage caused by provocation from Kirksey that was serious enough to incite him into using deadly force.

**{¶36}** Testimony that he did not intend to kill his victim does not entitle a defendant to a lesser-included offense instruction. *See State v. Campbell*, 69 Ohio St.3d 38, 48, 630 N.E.2d 339, *State v. Thomas*, 40 Ohio St.3d 213, 217–218, 533 N.E.2d 286(1988). *State v. Wright*, 4th Dist. No. 01CA2781, 2002–Ohio–1462, ¶ 26. Even though the defendant's own testimony may constitute some evidence supporting a lesser offense, if the evidence on whole does not *reasonably* support an acquittal on the murder offense and a conviction on a lesser offense, the court should not instruct on the lesser offense. *Campbell*, 69 Ohio St .3d at 47, 630 N.E.2d 339; *Shane,* 63 Ohio St.3d 632–633. "To require an instruction * * * every time "some evidence," however minute, is presented going to a lesser included (or inferior-degree) offense would mean that no trial judge could ever refuse to give an instruction on a lesser included (or inferior-degree) offense." *Shane* at 633, 590 N.E.2d 272. The same logic applies to a trial court's decision to charge a jury concerning an inferior degree of an offense.

**{¶37}** The evidence shows that when Ortiz killed Kirksey he was not under the influence of sudden passion or in a sudden fit of rage. Ortiz drove home and retrieved his

gun. In the case at bar, Ortiz admitted that he shot an unarmed Kirksey three times in the back at close range with a .45 caliber semiautomatic Hi-Point JHP handgun.  Ortiz admits he then retreated to the bar where he consumed alcohol and pills. Ortiz then testified, "After I shot him I hated [Kirksey]." Ortiz proceeds to return to where Kirksey is now being attend to by Fletcher. Fletcher begs him not to shoot; however, Ortiz put the gun to Kirksey's chin and fired.

{¶38} Past incidents or verbal threats do not satisfy the test for reasonably sufficient provocation when there is sufficient time for cooling off. *State v. Huertas*, 51 Ohio St.3d 22, 31–32, 553 N.E.2d 1058, 1068–1069(1990). *See, also, State v. Pierce*, 64 Ohio St.2d 281, 414 N.E.2d 1038(1980). In this case, there is no evidence that any past incidents provoked Ortiz into a sudden passion or fit of rage.

{¶39} Accordingly, Ortiz was not entitled to have the jury instructed on voluntary manslaughter.

**Murder.**

{¶40} Murder in violation of R.C. 2903.02(A), states: "No person shall purposely cause the death of another * * *"

{¶41}   R.C. 2901.22 Culpable mental states, provides:

(A) A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.

**{¶42}** The sole difference between aggravated murder in violation of R.C. 2903.01(A) is that prior calculation and design is absent from the offense of murder. *State v. Goodwin*, 84 Ohio St.3d 331, 345, 703 N.E.2d 1251, 1264 (1999), *cert. denied,* 528 U.S. 846,120 S.Ct. 118, 145 L.Ed.2d 100 (1999).

**{¶43}** Thus, Ortiz was entitled to a murder instruction only if the state's evidence was ambiguous on the element of prior calculation and design, such that a trier of fact could reasonably have found that Ortiz killed Kirksey purposefully but without prior calculation and design. *State v. Bethel,* 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 138; 143.

**Prior calculation and design.**

**{¶44}** There is no bright-line test to determine whether prior calculation and design are present. Rather, each case must be decided on a case-by-case basis. *State v. Taylor*, 78 Ohio St.3d 15, 18–20, 676 N.E.2d 82(1997). The Ohio Supreme Court has held, "Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." *State v. Cotton*, 56 Ohio St.2d 8, 381 N.E.2d 190(1978), paragraph three of the syllabus. *Accord*, *State v. Braden*, 98 Ohio St.3d 354, 785 N.E.2d 439, 2003–Ohio–325 at ¶ 61.

**{¶45}** Accordingly, to sustain Ortiz's aggravated murder conviction, the state had the burden of proving beyond a reasonable doubt that, under the facts and circumstances of this case, Ortiz had sufficient time and opportunity to plan Kirksey's death, and that, under the surrounding circumstances, Ortiz had a scheme designed to implement a calculated decision to kill Kirksey.

**{¶46}** "[P]rior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes." *State v. Coley*, 93 Ohio St.3d 253, 264, 2001–Ohio–1340, 754 N.E.2d 1129. In *State v. Conway*, 108 Ohio St.3d 214, 2006–Ohio–791, 842 N.E.2d 996, the Ohio Supreme Court held that one's actions could display a plan to kill. In *Conway*, upon hearing that his brother had been stabbed, Conway retrieved a gun from his car and began shooting at the alleged perpetrator. The Court held that "[a]lthough they took only a few minutes, Conway's actions went beyond a momentary impulse and show that he was determined to complete a specific course of action. Such facts show that he had adopted a plan to kill." Id. at ¶ 46, 842 N.E.2d 996.

**{¶47}** In the instant case, the evidence established that Ortiz conceived a plan to kill and acted on that plan with brutal composure. Ortiz had purchased the gun prior to the date of the incident. Ortiz drove home and retrieved his gun. In the case at bar, Ortiz admitted that he shot an unarmed Kirksey three times in the back at close range with a .45 caliber semiautomatic Hi-Point JHP handgun.  Ortiz admits he then retreated to the bar where he consumed alcohol and pills. Ortiz then testified, "After I shot him I hated [Kirksey]." Ortiz proceeds to return to where Kirksey is now being attend to by Fletcher. Fletcher begs him not to shoot; however, Ortiz put the gun to Kirksey's chin and fired.

**{¶48}** If the victim is killed in a cold-blooded, execution-style manner, the killing bespeaks aforethought, and a jury may infer prior calculation and design. *See State v. Campbell*, 90 Ohio St.3d 320, 330, 738 N.E.2d 1178(2000); *State v. Palmer*, 80 Ohio St.3d 543, 570, 687 N.E.2d 685(1997); *State v. Taylor*, 78 Ohio St.3d 15, 21, 676 N.E.2d 82(1997)

{¶49} We conclude that under all the evidence presented, no reasonable trier of fact could have found that Ortiz killed Kirksey purposefully but without prior calculation and design. Hence, Ortiz was not entitled to a lesser-included-offense instruction on murder.

**Conclusion.**

{¶50} The evidence shows that when Ortiz killed Kirksey he was not under the influence of sudden passion or in a sudden fit of rage. The evidence further shows that Ortiz acted purposefully with prior calculation and design. Ortiz's first assignment of error is overruled.

{¶51} Ortiz's first assignment of error is overruled.

II.

{¶52} In his second assignment of error, Ortiz argues that he was denied due process and equal protection because the trial court did not provide him an interpreter at trial.

{¶53} Ortiz never, either himself or through his attorney, requested the court provide him an interpreter. Under the doctrine of "invited error," it is well settled that "a party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make." *State ex rel. Smith v. O'Connor*, 71 Ohio St.3d 660, 663, 1995-Ohio-40, 646 N.E.2d 1115(1995) *citing State ex rel. Fowler v. Smith*, 68 Ohio St.3d 357, 359,1994-Ohio-302, 626 N.E.2d 950(1994). *See, also, Lester v. Leuck*, 142 Ohio St. 91, 50 N.E.2d 145(1943) paragraph one of the syllabus. As the Ohio Supreme Court has stated,

[t]he law imposes upon every litigant the duty of vigilance in the trial of a case, and even where the trial court commits an error to his prejudice, he is required then and there to challenge the attention of the court to that error, by excepting thereto, and upon failure of the court to correct the same to cause his exceptions to be noted. It follows, therefore, that, for much graver reasons, a litigant cannot be permitted, either intentionally or unintentionally, to induce or mislead a court into the commission of an error and then procure a reversal of the judgment for an error for which he was actively responsible.

*Lester* at 92-93, quoting *State v. Kollar* (1915), 93 Ohio St. 89, 91, 112 N.E. 196.

**{¶54}** At both the hearing held December 1, 2014 concerning his time waiver and the hearing held February 9, 2015 at which Ortiz rejected the state's plea offer, Ortiz demonstrated no difficulty in answering the court's questions and in raising his own questions and concerns. Ortiz demonstrated no difficulty understanding the trial judge, the purpose of each hearing and what he wanted to express to the judge. Ortiz could have, but did not ask for an interpreter at any of the hearings held before trial in the case at bar.

**{¶55}** R.C. 2311.14(A) requires that a trial court appoint an interpreter where a party "cannot readily understand or communicate" as a result of some impairment. Generally, a trial court has broad discretion in determining whether a criminal defendant requires the assistance of an interpreter. *See State v. Quinones*, 8th Dist. Cuyahoga. No. 44463, 1982 WL 5957(Oct. 14, 1982). Accordingly, this court shall not reverse a trial court's ruling in this regard absent a showing that the trial court acted unreasonably,

unconscionably, or arbitrarily. *State v. Apanovitch*, 33 Ohio St.3d 19, 22, 514 N.E.2d 394, 398(1987) ("abuse of discretion" defined).

**{¶56}** Moreover, Ortiz's testimony at trial established that he could effectively understand English and communicate in English. The record indicates that he responded to all questions directed to him. We also note that at no time did his counsel represent to the court that as a result of any alleged language barrier, Ortiz could not communicate with his counsel or that he could not comprehend the proceedings. See, *State v. Saah,* 67 Ohio App.3d 86, 95, 585 N.E.2d 999 (8th Dist. 1990); *Luna-Corna v. Esquivel-Parrales,* 12th Dist. Butler No. CA2008-07-175, 2009-Ohio-2628, ¶34; *State v. Marques,* 11th Dist. Ashtabula No. 2007-A-0085, 2008-Ohio-5324, ¶38.

**{¶57}** As a result, we cannot conclude that the trial court's failure to appoint an interpreter was arbitrary, unreasonable or unconscionable. Ortiz was not denied equal protection or due process by the trial court's failure to sua sponte appoint an interpreter.

**{¶58}** Ortiz's second assignment of error is overruled.

III.

**{¶59}** In his third assignment of error, Ortiz contends that he was denied the effective assistance of counsel. Specifically, he argues that counsel was ineffective for failing to file a suppression motion relative to his statements to police, for failing to move for a new trial (or more properly, a mistrial) when the victim's father made some gestures during trial, and for calling a police officer as a defense witness who testified about Ortiz's other crimes.

**{¶60}** A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of

reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness. *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180(1993); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373(1989).

**{¶61}** Counsel is unconstitutionally ineffective if his performance is both deficient, meaning his errors are "so serious" that he no longer functions as "counsel," and prejudicial, meaning his errors deprive the defendant of a fair trial. *Maryland v. Kulbicki,* 577 U.S. __, 2015 WL 5774453(Oct. 5, 2015) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

**Failure to file motion to suppress.**

**{¶62}** Trial counsel's failure to file a suppression motion does not per se constitute ineffective assistance of counsel. *State v. Madrigal,* 87 Ohio St.3d 378, 389, 2000–Ohio–0448. Counsel can only be found ineffective for failing to file a motion to suppress if, based on the record, the motion would have been granted. *State v. Lavelle,* 5th Dist. No. 07 CA 130, 2008–Ohio–3119, at ¶ 47; *State v. Cheatam,* 5th Dist. No. 06–CA–88, 2007–Ohio–3009, at ¶ 86. The defendant must further show that there is a reasonable probability that the outcome would have been different if the motion had been granted or the defense pursued. *See Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S.Ct. 2574, 2583, 91 L.Ed.2d 305 (1986); *see, also, State v. Santana*, 90 Ohio St.3d 513, 739 N.E.2d 798 (2001), *citing State v. Lott*, 51 Ohio St.3d 160, 555 N.E.2d 293 (1990).

**{¶63}** In order for an accused's statement to be admissible at trial, police must have given the accused a *Miranda* warning if there was a custodial interrogation. *Miranda*

*v. Arizona*, 384 U.S. 436, 471, 86 S.Ct. 1602, 16 L.Ed.2d 694(1966). If that condition is established, the court can proceed to consider whether there has been an express or implied waiver of *Miranda* rights. *Id.,* at 476, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

**{¶64}** A custodial interrogation occurs when a person has been taken into custody or otherwise deprived of his freedom of action in any significant way and a law enforcement officer questions that person. *Id.* "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.*

**{¶65}** In *Thompson v. Keohane,* 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), the Court offered the following description of the *Miranda* custody test:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

516 U.S., at 112, 116 S.Ct. 457 (internal quotation marks omitted). *Accord, Yarborough v. Alvarado*, 541U.S. 652, 653, 124 S.Ct. 2140, 158 L.Ed.2d 938(2004). The police and courts must "examine all of the circumstances surrounding the interrogation," *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293(1994), including those

that "would have affected how a reasonable person" in the suspect's position "would perceive his or her freedom to leave," *Id.,* at 325, 114 S.Ct. 1526. However, the test involves no consideration of the particular suspect's "actual mindset." *Yarborough,* 541 U.S. 652, 667, 124 S.Ct. 2140, 158 L.Ed.2d 938. *Accord, State v. Mason*, 82 Ohio St.3d 144, 153, 1998-Ohio-370, 694 N.E.2d 932(1998); *State v. Gumm* , 73 Ohio St.3d 413, 429, 1995 Ohio 24, 653 N.E.2d 253(1995).

**{¶66}** When Officer Perkins first encountered Ortiz, he asked what Ortiz was doing. 1T. at 149. Ortiz responded, "that he was reloading, smoking a cigarette and waiting for [the police]. Id. Ortiz then threw his handgun near a bush. At that point, Officer Perkins handcuffed Ortiz and checked him for weapons. Officer Perkins began to read Ortiz his *Miranda* rights, when Ortiz blurted out to the officer, "I shot him, I shot him." 1T. at 150.

**{¶67}** In the case at bar, Officer Perkins was attempting to inform Ortiz of his *Miranda* rights when Ortiz volunteered that he had shot Kirksey. It is evident from the record that the statements Ortiz made to the officer about the shooting were not made in response to any interrogation, but were entirely unsolicited. A suspect who voluntarily gives information without being asked questions is not subject to a custodial interrogation and is not entitled to *Miranda* warnings. *State v. McGuire*, 80 Ohio St.3d 390, 401, 686 N.E.2d 1112 (1997), *citing State v. Roe*, 41 Ohio St.3d 18, 22, 535 N.E.2d 1351 (1989). In other words, "*Miranda* does not affect the admissibility of '[v]olunteered statements of any kind.'" *State v. McGuire*, 80 Ohio St.3d 390, 401, 686 N.E.2d 1112 (1997), *citing Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

{¶68} Accordingly, Ortiz has failed in his burden to establish a reasonably possibility that a motion to suppress had one been filed would have been granted.

**Failure to move for a mistrial.**

{¶69} During the trial, Kirksey's father, who was watching the proceedings made angry gestures toward the jury,

[Defense Counsel]: During opening there was I believe it was the victim's father, the larger man back here sitting behind me, at one point when [the prosecutor] was I think describing what happened said something like damn or, you know, kind of an expression and it was loud enough for me to hear but I don't think anybody else in the courtroom. And there's an attorney from my office that's been sitting in the back and he kind of huffed or whatever, made some gesture, not loud enough for me to hear but they could hear.

So I'm a little worried about once we start bringing in, you know, the detective who's going to have pictures of him at the scene laying in blood and then we have autopsy I don't know if we need to instruct the family more.

1T. at 159.

{¶70} A trial court is afforded broad discretion in determining whether the conduct of a spectator was prejudicial to a criminal defendant as to constitute grounds for a mistrial. As the Ohio Supreme Court has stated,

As a reviewing court, we show deference to the trial judge, who sees and hears the events and thus is in a better position to accurately evaluate

the situation and determine the appropriate scope of inquiry. *State v. Huertas* (1990), 51 Ohio St.3d 22, 29, 553 N.E.2d 1058, 1067; *United States v. Ramos* (C.A.5, 1995), 71 F.3d 1150, 1153-1154. Therefore, we employ an abuse-of-discretion standard and will not reverse the trial court unless it has handled the alleged juror misconduct or ruled upon the post-trial motion in an "unreasonable, arbitrary, or unconscionable" manner. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 16 O.O.3d 169, 173, 404 N.E.2d 144, 149. *State v. Hessler,* 90 Ohio St.3d 108, 115-116, 2000-Ohio-30, 734 N.E.2d 1237.

**{¶71}** When a defendant moves for mistrial based on a bystander's conduct against him or her, the defendant has the burden to show that the jury was prejudiced by the bystander's conduct. In cases involving outside influences on jurors, "The complaining party must show actual prejudice, see, generally, Crim.R. 33(A), i.e., he must show that the communication biased one or more jurors." *State v. Herring*, 94 Ohio St.3d 246, 259, 762 N.E.2d 940 (2002) (citations omitted). The trial court is not required to conduct a hearing to determine the effect of the outside influences or conduct unless the complaining party shows actual prejudice. *Hessler,* 90 Ohio St.3d at 212-122, 2000-Ohio-30, 734 N.E.2d 1237.

**{¶72}** As these facts aptly demonstrate, there is nothing in the record, which indicates that any member of the jury saw or heard the spectator's gestures or remarks. Ortiz does not point to anything in the record to establish that any juror observed or heard the spectators conduct. Ortiz's trial counsel indicted that she did not believe anyone else heard the remarks. Her concern was directed toward preventing disruptions during the graphic portions of the trial that were yet to come. 1T. at 159.

**{¶73}**     Accordingly, we find counsel was not ineffective in failing to move for a mistrial or a new trial based upon spectator misconduct.

**{¶74}**  Ortiz next argues that he was denied effective assistance of counsel when his trial counsel called Officer Donnelly to testify and during the course of his testimony, the officer told the jury Ortiz had been arrest for driving under the influence in 2013. Counsel mentioned during closing argument that she called Donley to the stand to solidify his "rapport" with the officer. 2T. at 82.

**{¶75}**  A defendant has no constitutional right to determine trial tactics and strategy of counsel. *State v. Cowans*, 87 Ohio St.3d 68, 72, 717 N.E.2d 298(1999); *State v. Conway,* 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 150; *State v. Donkers,* 170 Ohio App.3d 509, 867 N.E.2d 903, 2007-Ohio-1557, ¶ 183(11th Dist.). Rather, decisions about viable defenses are the exclusive domain of defense counsel after consulting with the defendant. Id. When there is no demonstration that counsel failed to research the facts or the law or that counsel was ignorant of a crucial defense, a reviewing court defers to counsel's judgment in the matter. *State v. Clayton*, 62 Ohio St.2d 45, 49, 402 N.E.2d 1189(1980), citing *People v. Miller*, 7 Cal.3d 562, 573-574, 102 Cal.Rptr. 841, 498 P.2d 1089(1972); *State v. Wiley*, 10th Dist. No. 03AP-340, 2004- Ohio-1008 at ¶ 21.

**{¶76}**  Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel. *State v. Phillips*, 74 Ohio St.3d 72, 85, 1995–Ohio–171. Even if the wisdom of an approach is questionable, "debatable trial tactics" do not constitute ineffective assistance of counsel. Id. "(p)oor tactics of experienced counsel, however, even with disastrous result, may hardly be considered lack of due process * * *." *State v. Clayton*, 62 Ohio St.2d 45, 48, 402 N.E.2d 1189 (1980)(*quoting United States*

*v. Denno,* 313 F.2d 364 (2nd Cir.1963), *certiorari denied* 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143.

**{¶77}**  As previously set forth, there was no evidence presented at trial that Ortiz was provoked into a sudden passion or fit of rage. Further, the evidence showed that Ortiz acted purposefully with prior calculation and design. We find beyond a reasonable doubt that any testimony concerning Ortiz's prior conviction for operating a motor vehicle while under the influence did not contribute to Ortiz's convictions.

**{¶78}** Upon review, we are unpersuaded that Ortiz suffered demonstrable prejudice via defense counsel's eliciting testimony from a police officer during Ortiz's case in chief.

**{¶79}**  Ortiz's third assignment of error is overruled.

**{¶80}**  For the reasons stated in the foregoing opinion, the judgment of the Court of Common Pleas of Stark County, Ohio, is hereby affirmed.

By Gwin, J.,

Farmer, P.J., and

Wise, J., concur